# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Alexandria Division

| | |
|---|---|
| LUIS FUENTES, *et al.*, | ) |
|    Plaintiffs, | ) |
| | ) |
|    v. | )   Case No. 1:17-cv-880 |
| | ) |
| COXCOM INC., | ) |
|    Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

At issue in this § 1981 race discrimination case is whether a white employee who was given a final written warning is an appropriate comparator for plaintiffs, two African American employees who were terminated. Defendant argues summary judgment is appropriate because the white employee engaged in conduct that was less severe than that of plaintiffs. Plaintiffs oppose defendant's motion, contending that there is a genuine issue of material fact as to whether defendant terminated plaintiffs due to their race because the white employee engaged in conduct that was substantially similar to plaintiffs' conduct, and defendant did not terminate the white employee.

## I.[1]

Plaintiffs, Luis Fuentes ("Fuentes") and Wiley Hatchett ("Hatchett"), are former Cable Technicians for defendant. Fuentes identifies as Black Hispanic and Hatchett identifies as Black.

---

[1] The facts recited here are derived from defendant's list of undisputed facts, most of which were not specifically or properly disputed. Defendant, consistent with Local Rule 56(B) and the Rule 16(B) Scheduling Order, submitted in connection with its motion for summary judgment a separately captioned section listing in numbered-paragraph form all material facts as to which the defendant contends no genuine dispute exists. *See Fuentes v. Coxcom.*, No. 1:17-cv-880 (E.D. Va. Dec. 7, 2017) (Order). Plaintiffs, on the other hand, failed to comply with these rules. Specifically, plaintiffs did not dispute facts in separately numbered paragraphs, instead presenting all of their disputes in one paragraph. Moreover, plaintiffs did not specifically cite to any record evidence to support disputed facts and instead only generally cited to plaintiffs' declarations. Because plaintiffs did not comply with either the Scheduling Order or the Local Rules, the record has been scoured for facts that arguably could be viewed as conflicting with the facts recited here.

1

Defendant, CoxCom, Inc., is a Delaware corporation that provides TV, Internet, Digital Telephone, home security and technological solutions services for residential customers in the Fredericksburg, Virginia area.

Defendant employs Cable Technicians, or Universal Home Technicians, to troubleshoot customers' problems and install cable boxes at new customers' homes. There are three levels of Cable Technician depending on the Cable Technician's experience and performance: Emerging, Proficient, and Expert. Cable Technicians are hourly employees, and as a result, are expected to maintain accurate records of work orders and hours worked. Defendant's Corrective Action Policy provides that "deliberate or willful falsification, omission or alteration" of a company record is cause for immediate dismissal. *See* Cox Corrective Action Policy ¶ II.J; *see also* Cox Wage & Hour Compliance Policy ¶ G. Although Cable Technicians are expected to take jobs throughout the workday, Cable Technicians living within the area they service are permitted to return home during the day if they are not on a job, and at the end of the day, can park in front of their homes to wait for dispatch to call them with additional work. Brinklow Dep. 35: 10-21. Cable Technicians are also required to assist other Cable Technicians in between assigned jobs if they have time. *Id.* 36:16-21.

Fuentes was hired by defendant in 2002 as a Cable Technician. Around 2009, Fuentes moved to the Fredericksburg area and began reporting to Todd Brinklow ("Brinklow"), the Field Service Supervisor for that area. In 2010, Fuentes was promoted to an "Expert" level technician, and in 2014-2015, Fuentes served as a lead Cable Technician responsible for supervising other Cable Technicians. Fuentes consistently had good work evaluations throughout his employment with defendant and was one of the more efficient Cable Technicians under Brinklow's supervision. Hatchett was hired as a Cable Technician in 2001 under Brinklow and was

eventually selected to serve as Acting Supervisor in Brinklow's absence. Both Fuentes and Hatchett lived in houses within the footprint of the area they serviced.

As Field Service Supervisor, Brinklow had to conduct two quality checks per month of each Cable Technician who reported to him. During quality checks, supervisors go to customer locations and determine whether the Cable Technician has completed the assigned job. In December 2015, Brinklow completed a quality check on Hatchett and determined that Hatchett had not completed a job. Specifically, Hatchett had reported that he successfully disconnected a line, but when Brinklow arrived on site, the line was still connected. Brinklow reported the finding to his manager, Aaron Button ("Button"), who directed Brinklow to investigate the job and determine why it had not been completed. As a part of his investigation, Brinklow compared Hatchett's route and work for the day in ETA Direct[2] with Hatchett's GPS location through the Trimble report.[3] The comparison revealed discrepancies between where Hatchett should have been based on his work orders and where he actually was during these days. Brinklow reported these discrepancies to Button, and Button instructed Brinklow to audit all of Brinklow's Cable Technicians. Brinklow then compared the ETA Direct reports to the Trimble reports for all of his Cable Technicians and found additional discrepancies between work order locations and actual locations for Fuentes and William Frazier ("Frazier"), a white Cable Technician.

Brinklow concluded based on the discrepancies that all three employees—Hatchett, Fuentes, and Frazier—were "holding jobs." A Cable Technician "holds a job" if the Cable Technician opens a job on the company-issued tablet and then does not close the job promptly after he or she finishes the job. Brinklow testified that there could be many explanations for

---

[2] ETA Direct is the route management system that tracks the location of work orders assigned to particular technicians.

[3] There is a GPS device attached to each Cable Technician's van. The Trimble report tracks the GPS location of each Cable Technician's van throughout the day.

3

holding jobs. For example, a Cable Technician might hold a job in the event (i) the Cable Technician had issues with the Internet connection or functioning of the tablet and could not close the job immediately upon finishing it, Brinklow Dep. 51:12-52:8, 63:17-22; (ii) the Cable Technician forgot to close out the job; or (iii) the Cable Technician had trouble getting through to dispatch to report problems, Frazier Dep. 29:12-15; Brinklow Dep. 38:6-15, 51:12-52:8.

On January 5, 2015, Brinklow and Stephen Johnson ("Johnson") separately interviewed Fuentes, Hatchett, and Frazier to determine why they were holding jobs. Brinklow presented the three employees with the reports showing the discrepancies between their GPS locations and their work order locations and gave each employee the opportunity to prepare a written statement. All three employees prepared statements.

In his written statement, Fuentes offered an explanation for each of the discrepancies between his GPS location and his work order locations. Specifically, Fuentes explained that:

- On December 13, Fuentes drove to the wrong street and later started having problems with his tablet, which prevented him from closing his jobs.[4]

- On December 15, Fuentes mentioned that he drove to a job but the job was taken from him before he arrived. He subsequently parked his car to call dispatch for a new assignment but dispatch did not return his calls. Later that day, Fuentes had problems with his tablet, again preventing him from closing out his jobs.

- On December 16, Fuentes explained that he went home to use the restroom and forgot to close out a job.

- On December 19, Fuentes stated that he forgot to close out one of his jobs, closed one job by mistake, and forgot to start another job when he began helping another employee.

- On December 20, Fuentes stated that he was having trouble with his tablet all day.

---

[4] Indeed, Fuentes had complained to Brinklow about his tablet malfunctioning at least once before. Brinklow Dep. 36:22-37:3.

4

Fuentes Dep. Ex. 11.

Hatchett explained in his meeting with Brinklow that Hatchett was helping other Cable Technicians when his GPS location differed from his work order location and forgot to close out his previous jobs. Hatchett Decl. ¶ 3. When it came time to prepare his written statement, Hatchett testified that Brinklow told Hatchett to prepare a written statement to save his job, not a statement explaining his whereabouts on the dates when there were discrepancies. Hatchett Dep. 91:1-15; 112:2-14. Accordingly, in his written explanation, Hatchett admitted that he "did not follow policy in closing out [his] jobs." Hatchett Dep. Ex. 7.

In his written statement, Frazier explained that on many occasions he forgot to end a completed job and start a new job until he arrived at his subsequent job. Frazier also explained that most of the times when discrepancies appeared between his GPS location and his work order location, Frazier was helping other Cable Technicians. At the same time, Frazier did not provide explanations for some of the discrepancies, simply stating that he "always do[es] [his] work, and . . . help[s] out the other techs whenever [he] can . . ." Brinklow Dep. Ex. 3.

After Brinklow and Johnson met with the three employees, Brinklow prepared reports and recommendations related to his investigation. With respect to Fuentes, Brinklow completed a Request for Approval to Separate Employee. In the Request, Brinklow explained his reasons for requesting termination as follows:

> While conducting a routine investigation it was determined that there were significant discrepancies between Luis Fuentes's route management reporting and his actual whereabouts as reported by his vehicle's GPS. These discrepancies were brought to Luis's attention for review and comment on January 5th, 2015. Luis shared explanations for some of these discrepancies and for others he stated that his tablet device was not working properly. His statements were then reviewed in conjunction with his route management reporting and his vehicle's GPS reporting. Upon completion of this review it was found that there was a trend of instances that do not corroborate this explanation. On numerous occasions throughout the month of December it was found that Luis completed work early without accounting for it in route management until later in the

5

day. In these instances it was confirmed through GPS reporting that he went home prior to the close of his scheduled shift and then logged starting and completion times for his work as if it was being done later in the day. A trend was identified where significant patterned delays were made in starting and completing work while at home that evidenced a working tablet and an intent to delay the closure of completed work. This could potentially have a negative affect [sic] on our ability to provide timely customer service. Furthermore, while route management activities were being falsified Luis remained on the time clock, without notifying his leader of his early departure or clocking out when he completed his work for the day.

Request for Approval to Separate Employment Fuentes (Doc. 20-7). Brinklow concluded based on this evidence that Fuentes "falsified both his route management and time keeping records, and intentionally left completed calls open to avoid taking on additional work" and recommended termination. *Id.*

Brinklow similarly prepared a Request for Approval to Separate Employment recommending Hatchett's termination. Specifically, in the Request, Brinklow explained his termination request as follows:

> While conducting routine monthly work inspections for the month of December it was found that Wiley Hatchett closed a disconnect work order without ever physically completing the work. On the second inspection there was no evidence that work was completed on the exterior of the home. These findings prompted further investigation which revealed that there were significant discrepancies between Wiley's route management reporting and his actual whereabouts as reported by his vehicle's GPS. These discrepancies were brought to Wiley's attention for review and comment on January 5th, 2015. Wiley stated that he had no explanation for these discrepancies and that he knew what he did was wrong. Upon completion of this review it was found that not only did Wiley report the completion of work that he had not actually completed, he routinely falsified his route management and time keeping records. Evidence shows that he routinely took extended breaks beyond what is allowed or appropriate, went home early for the remainder of the day while reporting active work engagement and did so while remaining on the time clock. This action constitutes call avoidance and could potentially have a negative impact on our ability to provide timely customer service. These activities all took place without notifying his leader.

Request for Approval to Separate Employment Hatchett (Doc. 20-8). Brinklow concluded based on this evidence that Hatchett "falsified records of work completed, route management and time

keeping, and intentionally left completed calls open to avoid taking on additional work" and recommended termination. *Id.*

Although Brinklow also found that Frazier was holding jobs,[5] Brinklow did not recommend Frazier's termination and instead completed a Corrective Action Form, recommending a final written warning. In the Corrective Action Form, Brinklow stated that his investigation revealed that Frazier was, in fact, helping his peers with assigned work when he was allegedly holding jobs. Brinklow stated that he found no evidence that Frazier held jobs with intent to avoid work. Corrective Action Form Frazier.

Brinklow and Johnson subsequently submitted the Requests for Approval to Separate Employment for Hatchett and Fuentes to Human Resources and the VP of Field Services. On January 9, 2015, Fuentes and Hatchett were terminated for "holding jobs" to avoid work while Frazier was given a final written warning. In his deposition, Brinklow explained that Fuentes and Hatchett were terminated, while Frazier was retained, because Brinklow's review of the records revealed that Frazier was assisting his peers while Fuentes and Hatchett were "sitting around for hours doing nothing." Brinklow Dep. 62:22-63:1. At the same time, Brinklow admitted in his deposition that he did not, in fact, know where Fuentes and Hatchett were or what they were doing during the time they were alleged to be holding jobs. *Id.* 63:11-16.

Fuentes filed this complaint on August 2, 2017, asserting one claim of race discrimination pursuant to 42 U.S.C. § 1981. On December 8, 2017, Fuentes filed an amended complaint and added Hatchett as a plaintiff. On March 13, 2018, defendant filed the Motion for Summary Judgment at issue here, contending that Frazier is not an adequate comparator for plaintiffs and that plaintiffs have adduced no evidence suggesting that plaintiffs were terminated

---

[5]*See* Brinklow Dep. 62:5-18.

because of their race. Plaintiffs oppose this motion, arguing that the fact that defendant gave Frazier a final written warning while terminating plaintiffs creates a genuine issue of material fact as to whether race was the true reason for plaintiffs' termination.

## II.

The standard of review on motions for summary judgment is too well-settled to warrant extensive discussion. Under Rule 56, Fed. R. Civ. P., summary judgment is appropriate only where there is "no genuine dispute as to any material fact" such that the moving party "is entitled to judgment as a matter of law." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists if "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating this question, courts must "view the evidence in the light most favorable to . . . the nonmovant." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The nonmovant, however, cannot rely on "mere allegations;" rather, the nonmovant "must set forth specific facts that go beyond the mere existence of a scintilla of evidence." *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) (internal quotations and citations omitted).

## III.

The Fourth Circuit has made clear that the *McDonnell-Douglas* burden shifting framework applies where, as here, the plaintiff asserts a claim pursuant to § 1981 and does not adduce direct evidence of discrimination. *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of race discrimination. To establish a prima facie case of discrimination in this disparate discipline context, the plaintiff must show

> (1) that he is a member of [a protected class], (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected

> class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees.

*Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993) (citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir.1985)). Where a plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for the action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 977, 802 (1973). If the defendant successfully does so, the burden shifts back to the plaintiff to show that the legitimate nondiscriminatory reason is mere pretext.

Here, defendant concedes that plaintiffs, as African Americans, are members of a protected class and that the disciplinary measure enforced against them—termination—was more severe than the measure enforced against Frazier, a white employee. Defendant, however, argues that plaintiff has not established that the prohibited conduct in which plaintiffs engaged was comparable to Frazier's conduct.

There is a genuine issue of material fact as to whether the prohibited conduct engaged in by plaintiffs was comparable in seriousness to that of Frazier. Plaintiffs were in the same position as Frazier—they were all Cable Technicians. And importantly, Brinklow found that plaintiffs committed the same underlying violations as Frazier—holding jobs by failing to close out jobs immediately after finishing them. Defendant argues that Frazier's conduct was less serious than Fuentes's and Hatchett's conduct because Frazier was helping other Cable Technicians when he held jobs whereas Fuentes and Hatchett were not. But the record reflects a factual dispute on this point. On the one hand, Brinklow testified that his review of the GPS reports revealed that Fuentes and Hatchett were not actually helping other Cable Technicians when they were holding calls. Brinklow Dep. 72:14-73:2. But Fuentes and Hatchett averred that they were helping other Cable Technicians. Fuentes Decl. ¶ 3; Hatchett Decl. ¶ 3. And

9

Fuentes's written statement provided in the January 5, 2015 interview reflects that he provided this explanation for his whereabouts to Brinklow. Fuentes Dep. Ex. 11. Importantly, the record does not contain the underlying GPS data that would definitively confirm that Frazier's explanation was corroborated while Fuentes's and Hatchett's explanations were refuted, and as such, there is a genuine factual dispute as to whether Fuentes's and Hatchett's conduct was comparable in seriousness to Frazier's conduct.

In sum, the undisputed factual record discloses that defendant gave a white employee a final written warning and imposed a more severe sanction—termination—on African American employees. Because there is a genuine factual dispute as to whether the white employee engaged in misconduct "comparable in seriousness" to plaintiffs' misconduct, plaintiffs have satisfied their prima facie case of disparate discipline.

Given that plaintiffs have satisfied their prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the action. Where, as here, a comparator receives less severe punishment than a plaintiff, Fourth Circuit precedent provides that "[t]he defendant may not discharge its burden [of articulating a legitimate nondiscriminatory reason] by merely restating the offense for which the plaintiff was disciplined;" rather, the defendant must produce "evidence available only to the defendant, such as insight into the discretionary factors underlying defendant's decision to discipline two individuals differently." *Moore*, 754 F.2d at 1106 (citations omitted). Defendant again cites to Brinklow's investigation, arguing that defendant terminated plaintiffs and retained Frazier because in contrast to plaintiffs, who were intentionally holding jobs to avoid additional work, Frazier was helping other Cable Technicians while he was holding jobs. By offering an explanation for the discrepancies in its disciplinary measures, defendant has articulated a legitimate nondiscriminatory reason for its actions.

But this does not end the inquiry because there remains a genuine dispute of material fact as to whether this legitimate nondiscriminatory reason for distinguishing between plaintiffs and Frazier is pretextual. On the one hand, when Brinklow recommended terminating Fuentes and Hatchett, Brinklow explained that his review of the GPS reports revealed that Fuentes and Hatchett were not helping other Cable Technicians or experiencing problems when they were holding jobs, but instead were intentionally avoiding work. *See* Request for Approval to Separate Employment Fuentes; Request for Approval to Separate Employment Hatchett. On the other hand, Fuentes and Hatchett averred, and Fuentes explained in his written statement, that, like Frazier, they were helping other Cable Technicians or experiencing problems with their tablets during the times they were accused of holding jobs. Fuentes Decl. ¶ 3; Hatchett Decl. ¶ 3; Fuentes Dep. Ex. 11. And Brinklow admitted in his deposition that he did not actually know where Fuentes and Hatchett were and what they were doing when they were holding jobs. Brinklow Dep. 63:11-16. Significantly, the record does not contain the underlying GPS or work order reports that would allow for resolution of this factual dispute. As such, resolution of this question requires a fact finder to decide whether to believe Brinklow or to believe Fuentes and Hatchett—a determination that is indisputably within the province of a jury, not a judge. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … ."). Accordingly, defendant's summary judgment motion must be denied.

**IV.**

In sum, the record discloses that Frazier, a white employee of defendant, and plaintiffs, African American employees of defendant, committed similar misconduct when they failed to close jobs promptly after they finished the work. Despite this similar misconduct, defendant

terminated plaintiffs while only issuing a final written warning to Frazier. Although defendant attempts to justify the discrepancy by arguing that the data revealed that Frazier was assisting other employees when he held jobs, no such data is contained in the record. Accordingly, there is a genuine dispute of material fact as to whether race was the true motivation for defendant's disparate discipline of its employees, and summary judgment is inappropriate.

An appropriate Order will issue.

Alexandria, Virginia
May 1, 2018

/s/
T. S. Ellis, III
United States District Judge